UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA NOTTER, | Case No.16-cv-04412-JSC |
| Plaintiff, | |
| v. | **ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| CITY OF PLEASANT HILL, et al., | Re: Dkt. Nos. 56, 60 |
| Defendants. | |

Plaintiff Lisa Notter brings this civil action alleging violation of her civil rights in connection with her arrest at her home following a noise complaint regarding the music at her daughter's wedding reception. The parties' cross-motions for summary judgment are now pending before the Court. (Dkt. Nos. 56 and 60.) Having considered the parties' briefs and having had the benefit of oral argument on June 22, 2017, the Court DENIES the parties' cross motions for summary judgment. Given the multiple factual disputes with respect to each of Plaintiff's claims, summary judgment is inappropriate.

**SUMMARY JUDGMENT EVIDENCE**

Plaintiff Lisa Notter planned to host her daughter's wedding reception at her home in Pleasant Hill, California on August 8, 2015. (Dkt. No. 65-2, Notter Decl. ¶ 2.) In advance of the reception, she contacted the Pleasant Hill Police Department to inquire whether there were any noise restrictions in place and whether there was anything she should do in advance. (*Id.*) The officer she spoke with advised her that there "there were none *per se*, but that the music should be turned down by midnight." (*Id.* (emphasis in original).) The officer recommend that she

distribute a flyer to her neighbors advising them of the wedding reception and that music would be played until 12 a.m. (*Id*.) Plaintiff was also advised to send a copy of the flyer to the Pleasant Hill Police Department. (*Id*.) Plaintiff created such a flyer and distributed it to her neighbors and provided a copy to the Pleasant Hill Police Department. (*Id*.; Dkt. No. 65-2 at 9.[1])

On the night of the wedding, Pleasant Hill Police Department Watch Commander Sergeant Ronald Priebe made note of the flyer regarding the wedding reception at the start of shift briefing. (Dkt. No. 61-1 at 6 (Police Report); Dkt. No. 61-2, Wright Depo. at 59:15-23; Dkt. No. 65-1 at 44, Priebe Depo. at 69:22-70:20.) At 10:18 p.m. that night, the Pleasant Hill Police Department received a noise complaint regarding 503 Masefield Dr. (Dkt. No. 61-1 at 3 (Police Report).) Sergeant Priebe thereafter matched the noise complaint to the flyer from the briefing earlier that evening and although there was no phone number on the flyer, he looked up the phone number associated with the address and receiving no answer left a voicemail advising the home owners of the noise complaint. (Dkt. No. 61-4, Priebe Depo. at 88:15-89:19.)

Officers Chelsea Wright and Sean Bias, who worked as beat partners, were thereafter dispatched to 503 Masefield Drive—Plaintiff's residence—at 11:15 p.m.[2] (Dkt. No. 61-1 (Police Report); Dkt. No. 61-2, Wright Depo. at 72:12-17; Dkt. No. 61-3, Bias Depo. at 100:13-19.) They arrived separately. (Dkt. No. 61-3, Bias Depo. at 99:19-100:12.) Officer Wright arrived first at 11:18 p.m. (Dkt. No. 65-1 at 74:17-19.) Upon her arrival, she encountered three to five young adults standing outside the house who were acting as valets for the party. (*Id*. at 75:12-24; 77:22-24.) She asked if any of them were the homeowner and they all denied being the homeowner. (*Id*. at 76:3-16.) According to Officer Wright the music was so loud she felt like she was screaming or raising her voice very high just to hear herself talk." (*Id*. at 78:14-20.) The front door was open. (Dkt. No. 65-2, Notter Decl. at ¶ 4; Dkt. No. 65-1 at 12, Wright Depo. at 126:9-11.) Officer Wright testified that she did not ask any of the valets whether she could enter the house, but one of

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] Officer Wright has since married and changed her surname to Ortega, and has been promoted to Detective. For purposes of clarity, the Court nonetheless refers to her as Officer Wright—her name and title at the time of the incident—throughout.

the valets offered to help her find the homeowners and he escorted Officer Wright into the house. (*Id*. at 125:1-7; 132:6-16.)

Several individuals, including one of the valets, Dante Deluca, dispute Officer Wright's version of events. Dante Deluca testified that the exchange with Officer Wright went as follows: "She was like, where's the owner of the house. And I was like, I think they're in the back. I'll go get them. And then I went into the backyard, and before I could even find her, I look on the dance floor and the cop's talking to Lisa Notter." (Dkt. No. 65-1, Deluca Depo. at 8:17-23; Dkt. No. 65-1 at 64 (Dante Deluca Decl.).) Likewise, Lynn Deluca testified that when Officer Wright approached and asked where the homeowners were, Dante said "I can go get them for you" and started walking towards the front door. (Dkt. No. 65-1 at 55, Lynne Deluca Depo. at 11:28-24.) Ed Deluca testified to the same effect: Dante "said, hold on, I'll go get them." (Dkt. No. 65-1 at 61, Ed Deluca Depo. at 9:12.)

The parties agree that when Officer Wright arrived in the backyard she approached Plaintiff who confirmed that she was the homeowner. Officer Wright then advised Plaintiff that there had been a noise complaint regarding the music and she needed to turn the music off. (Dkt. No. 61-2, Wright Depo. at 84:19-24.) The parties also agree that Plaintiff advised Officer Wright that she had contacted the police department in advance and they told her that she was allowed to have the music on until midnight. (*Id*. at 85:1-10.) Thereafter, however, the parties' version of events again diverges.

**1) Plaintiff's Version of Events Regarding the Arrest**

Officer Wright approached Plaintiff in the backyard with her hand on her gun and told Plaintiff in a loud and aggressive manner: "I'm shutting you down" and made a cut-off sign with her hand. (Dkt. No. 65-1 at 109, Notter Depo. 114:7-116:11; Dkt. No. 65-2, Notter Decl. at ¶ 5.) Plaintiff responded that she had permission to have the music on from the police department, Officer Wright stated "no, you didn't," "you don't know shit about the rules", and repeated that she was shutting the party down. (Dkt. No. 65-1 at 109, Notter Depo. at 117:4-14; Dkt. No. 65-2, Notter Decl. at ¶ 6.) Plaintiff's husband attempted to come over to talk to Officer Wright and she told him to "get back sir, I will speak to your wife." (Dkt. No. 65-2, Notter Decl. at ¶ 6.) Plaintiff

3

was concerned because Officer Wright "was standing excessively close" to her. (*Id.*) Plaintiff is a petite, 63 year-old woman. (*Id.*) Plaintiff then turned away from Officer Wright to tell the DJ to turn the music off. (Dkt. No. 65-1 at 109, Notter Depo. at 117:22-23.) There was a small plastic cup in Plaintiff's right hand which was half full of water and as she was turning she threw her hands in the air to say "whatever" and the contents of the cup of water flew into the air. (*Id*. at 119:6-13; Dkt. No. 65-2, Notter Decl. at ¶ 7.) Plaintiff took one or two steps and the next thing she knew she had an officer on either side of her "pushing" her towards the side of the house. (Dkt. No. 65-1 at 110, Notter Depo. at 120:15-24.) Once in the side yard, Officer Wright spoke to someone on the radio, and immediately thereafter, the officers ordered Plaintiff to put her arms behind her back. (*Id*. at 130:11-19.) Plaintiff called Officer Wright a "bitch" and as the officers handcuffed her she cried out "you are hurting me" to which Officer Wright responded "Oh, does this hurt?" and tightened the handcuffs over Plaintiffs' bracelets. (*Id*. at 130:22-131: 24.) Plaintiff cried out multiple times that the officers were hurting her, but the officers ignored her. (*Id*. at 133:18-22.) During this time, Plaintiff directed derogatory remarks such as "bitch," "jackass," and "cunt" at the officers. (Dkt. No. 65-2 at ¶ 10.)

Plaintiff was then pushed out the gate of the side yard into the front yard with the officers lifting her along; during this process one of the officers hit her back left heel at which point Plaintiff said "you're hurting me" and her knees buckled. (*Id.* at 133:24-135:21.) Plaintiff was then taken over to the police vehicle and "pushed over the trunk of the car with [her] hands behind her back." (*Id*. at 137:0-14.) Officer Wright then forcefully put Plaintiff in the police vehicle. (*Id*. at 139:9-10.) While being driven to the station, Plaintiff continued to call Officer Wright a bitch and told her that she single handedly ruined her daughter's wedding. (*Id*. at 142:19-143:12.) On a turn, Plaintiff fell over on her side and asked Officer Wright to help, but she did not respond. (*Id*. at 143:18-144:14.)

Several other witnesses confirm Plaintiff's version of events. Plaintiff's husband testified that his wife and Officer Wright were arguing and when Plaintiff turned around to tell the DJ to turn off the music, some water flew out of a cup that she was holding. (Dkt. No. 65-1, Craig Notter Depo. at 42:15-24.) Although he did not see the water land on Officer Wright, she

4

immediately began yelling that she had been assaulted. (*Id*. at 43:20-21.) Officer Wright then got on her radio and was saying "this is assault, right?" (*Id*. at 45:22-24.) Both Officer Wright and Officer Bias then escorted Plaintiff off the dance floor and into the side yard; in doing so, "they roughly grabbed her arms and lifted her, and she tip toed where they wanted her to go." (*Id*. at 46:17-23.) He later heard Plaintiff say "you're hurting me." (*Id*. at 51:4.) He then saw Plaintiff taken from the side yard over to the police vehicle where she was pushed onto the trunk of the vehicle and he could hear the pain in her voice. (*Id*. at 52:6-24.) The officers then put her in the back seat and drove off. (*Id*. at 54:2.)

Wedding guest Nancy Hill attests that both Officer Bias and Officer Wright were present from the beginning of the altercation, and Officer Wright got in Plaintiff's face while scolding her about the noise. (Dkt. No. 65-3, Hill Decl. at ¶ 2.) According to Ms. Hill, Plaintiff turned around, said "[b]ut this is my house!" and walked away from the officer while tossing cup of water in the air. (*Id*.) At the same time, Officer Wright stepped forward and the water landed on her. (*Id*.) The "lady officer then looked at the other officer and said 'that's assault' and they quickly proceeded and went after Mrs. Notter as she was walking around the house." (*Id*.) Ms. Hill could not see the officers or Plaintiff, but heard Plaintiff say "[s]top! You're hurting me!! I didn't do anything wrong! This is my daughter's wedding reception! Leave me alone!" (*Id*.)

Another guest, Jonathan Antes, submitted a declaration attesting that Plaintiff "thr[e]w up her hands in disgust, and tossing her small cup of water with it." (Dkt. No. 65-1 at 86 (Antes Decl.).) He further attests that the officers chased after Plaintiff and a few minutes later he walked over saw Plaintiff handcuffed and she kept repeating "you're hurting me, you're hurting me." (*Id*.) Likewise, Dante Deluca, the valet, testified that Plaintiff was screaming as the officers tightened her cuffs and after Plaintiff asked if the officers could move the handcuffs off her bracelets, but they instead tightened them more. (Dkt. No. 65-1 at 50, Dante Deluca Depo. at 9:16-25.)

### 2) Defendant's Version of Facts Regarding the Arrest

For her part, Officer Wright insists that Plaintiff was belligerent, argumentative, and appeared intoxicated from the beginning of the encounter. (Dkt. No. 61-2, Wright Depo. at 85:11-

5

19.) Officer Wright testified that Plaintiff uttered several profanities, called Officer Wright a "bitch" and stated that she was ruining her daughter's wedding. (*Id*. at 86:7-14.) Shortly after Officer Wright's arrival, the DJ turned the music down and Plaintiff asked if it was good enough to which Officer Wright responded, "no, it has to be all the way off." (*Id*. at 86:15-18.) Plaintiff then turned away from Officer Wright and "with the cup that she had in her hand, threw it over her shoulder in my direction, which caused the contents of that cup to land on my shoulder." (*Id*. at 87:22-88:2.) Officer Wright turned to look for backup because she was concerned the situation was escalating and saw Officer Bias walking towards her on the dance floor. (*Id*. at 88:8-11.) Officer Wright told Officer Bias that Plaintiff had just thrown water at her and the officers escorted Plaintiff to the side yard. (*Id*. at 88:12-89:3.) While this was happening, Plaintiff was yelling at the officers calling Officer Wright a "bitch" and Officer Bias a "jackass," and stating that both were ruining her daughter's wedding. (*Id*. at 89:5-9.) Officer Wright called Sergeant Priebe, the watch commander, over her radio to inform him what happened and he confirmed that she should make an arrest. (*Id*. at 90:2-8.) Officer Wright then attempted to handcuff Plaintiff, but she was pulling away and screaming "I'm the mother of the bride you bitch." (*Id*. at 90:18-24.) Officer Wright received an abrasion on her hand trying to handcuff Plaintiff, but eventually she got the handcuffs on. (*Id.* at 90:25-91:4.) Officer Wright recalls Plaintiff saying something about her bracelets as she did so, so she adjusted the handcuffs. (Dkt. No. 65-1 at 21, Wright Depo. at 205:16-19.) However, Officer Wright does not recall Plaintiff complaining that the handcuffs were hurting her. (*Id*. at 207:15-208:15.) As the officers moved Plaintiff from the side yard into the front yard, she dropped her weight on the officers and dug her nails into Officer Wright's hands. (Dkt. No 61-2, Wright Depo. at 91:16-22.) Plaintiff was then placed in the police vehicle. (*Id*. at 92:2-3.) Officer Wright drove Plaintiff to the Pleasant Hill Police Station.

Officer Bias generally corroborates Officer Wright's version of events. According to the logs, he arrived at Plaintiff's home a minute after Officer Wright. (Dkt. No. 61-3, Bias Depo. at 105:23.) He testified that within ten seconds of his arrival in the backyard Officer Wright had advised him of the assault and the officers laid hands on Plaintiff to move her off the dance floor. (Dkt. No. 65-1 at 36, Bias Depo at 21:25.) Plaintiff was cursing as she was being escorted to the

6

side yard. (*Id*. at 125:4-6.) Officer Wright then informed Officer Bias that Plaintiff was being arrested for violation of Penal Code 243(B). (*Id*. at 158:16-18.) Each officer then grabbed one of Plaintiff's wrists, pulled her hands behind her back and handcuffed her. (*Id.* at 159:2-5.) Officer Bias does not recall Plaintiff complaining that the handcuffs were hurting her. (*Id*. at 160:5-21.) The officers then escorted Plaintiff into the front yard and as they did so Plaintiff dropped her weight so that the officers had to carry her to the vehicle. (Dkt. No. 61-3, Bias Depo. at 129:2-7.)

Sergeant Priebe arrived at Plaintiff's residence after she had been loaded into the squad car. (Dkt. No. 61-4, Priebe Depo. 95:3-9.) Sergeant Priebe spoke briefly to Plaintiff's husband and son-in-law, but they said they had not seen what happened prior to the arrest. (*Id*. at 98:22-25.)

### 3) Facts Following the Arrest

Both parties' versions of what transpired at the Pleasant Hill Police Station are largely the same and are supported by the transcription of audio from the station. (Dkt. No. 65-1 at 90-106.) At the police station, Plaintiff was led to a bench and immediately asked to use the restroom. (Dkt. No. 61-2, Wright Depo. at 221:3-6; Dkt. No. 65-1 at 91 (audio transcription.) The officer did not respond to her request to use the restroom and instead took down some information and searched Plaintiff. (Dkt. No. 65-1 at 92.) Sergeant Priebe then arrived and spoke with Plaintiff. He explained about the noise complaint and Plaintiff said "you've managed to ruin my daughter's wedding" to which Sergeant Priebe stated "Okay, I see it a different way." (*Id*. at 94.) Plaintiff went on to describe Officer Wright as a "belligerent human" and stated "I tossed water over my shoulder, princess got in the way. Her left shoulder got a little water on it." (*Id*.) Sergeant Priebe responded that it was an assault and Plaintiff said "I was not aiming at her." (*Id*.) Officer Wright then read Plaintiff her rights and Plaintiff asked to speak to an attorney. (*Id*. at 96.) Sergeant Priebe then began processing Plaintiff and said "now the point from now forward was whether you're going to be cooperative, which you have been so far, okay, and reasonable. Okay [So you] get to decide whether you go to county jail or go home." (*Id*. at 98 (additional text in original).) Plaintiff responded that she would like to go home. (*Id*.) Sergeant Priebe stated "I bet you would. But I'm not going to have you stare her down and talk a bunch of crap, okay? You can have your

opinion, you're totally entitled to that, okay? But we're not going to be petty and we're not going to continue to act like we're intoxicated and can't care for ourselves. Because if that is the case, then I have to send you to jail until you're sober. Do you understand that?" (*Id.*) Plaintiff responded "absolutely" and asked to go to the bathroom again. (*Id.*) She was told "in just a little bit." (*Id.*) Nothing happened for another nearly six minutes and then Plaintiff again asked to use the restroom and was given permission to do so. (*Id*. at 99.) Officer Wright then asked Plaintiff to sign some paperwork and take off her jewelry. (*Id*. at 100.) Plaintiff was then told that she was being transferred to the county jail. (*Id*. at 101.) Plaintiff responded "[b]ut you said that if I cooperated that I could go home." Sergeant Priebe responded "[y]ou're functionally cooperating but the attitude test has not been passed." (*Id*.)

Plaintiff was transferred to the county jail in Martinez where she spent the night. (Dkt. No. 65-2, Notter Decl. at ¶ 11.) She was released the following morning. (Dkt. No. 65-1 at 80, Craig Notter Depo. at 61:8-62:14.) She alleges that following the incident with Officers Wright and Bias, she had bruising on her wrists, arms, and torso, as well as a fracture on her heel. (Dkt. No. 65-1 at 117, Notter Depo. at 194:3-197:18; 209:16-23.)

## PROCEDURAL HISTORY

A year after the incident, Plaintiff filed this civil action against the City of Pleasant Hill, the Pleasant Hill Police Department, and Officer Chelsea Wright. (Dkt. No. 1.) Plaintiff pled 14 claims for relief including claims under Section 1983 and state law. Defendants moved to dismiss for failure to state a claim and the Court granted the motion in part and denied it in part. (Dkt. Nos. 8 & 22.) Plaintiff thereafter filed her First Amended Complaint which again pleads 14 claims for relief against Defendants the City of Pleasant Hill, Officer Wright, Officer Bias, and Sergeant Priebe: (1) unconstitutional search in violation of Section 1983 (as to Wright); (2) unconstitutional seizure in violation of Section 1983 (as to Wright and Bias); (3) excessive force in violation of Section 1983 (as to Wright and Bias); (4) unconstitutional search in violation of the Bane Act, California Civil Code Section 52.1 (as to Wright and Pleasant Hill); (5) unconstitutional seizure in violation of the Bane Act, California Civil Code Section 52.1 (as to Wright, Bias, and Pleasant Hill); (6) excessive force in violation of the Bane Act, California Civil Code Section 52.1

1 (as to Wright, Bias, and Pleasant Hill); (7) violation of Plaintiff's First Amendment rights under the Bane Act, California Civil Code Section 52.1 (as to Wright, Priebe, and Pleasant Hill); (8) invasion of privacy (as to Wright, Bias, and Pleasant Hill); (9) trespass (as to Wright, Bias, and Pleasant Hill); (10) false imprisonment/arrest (as to Wright, Bias, Priebe, and Pleasant Hill); (11) battery and assault (as to Wright, Bias, and Pleasant Hill); (12) intentional infliction of emotional distress (as to Wright); (13) defamation (as to Wright, Does, and Pleasant Hill); and (14) negligence (as to Wright, Bias, Priebe, and Pleasant Hill). (Dkt. No. 27.) Plaintiff thereafter voluntarily dismissed her 13th claim for defamation and all claims as to Sergeant Priebe. (Dkt. No. 35.) Officers Wright and Bias, and Pleasant Hill thereafter answered the complaint. (Dtk. No. 36.)

Plaintiff then filed the now pending motion for partial summary judgment and Defendants filed a motion for summary judgment on all of Plaintiff's claims. (Dtk. Nos. 56 & 60.)

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The Court must draw "all reasonable inferences [and] resolve all factual conflicts in favor of the non-moving party." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004). A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There can be "no genuine issue as to any material fact" when the moving party shows "a complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the party moving for summary judgment does not bear the burden of proof at trial (usually the defendant), the party has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that the opposing party cannot produce evidence sufficient to satisfy her burden of proof at trial. *Nissan Fire & Mar. Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets that burden,

the non-moving party must show that a material factual dispute exists. *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). When the party moving for summary judgment would bear the burden of proof at trial (usually the plaintiff), "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citation omitted). "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Id*. (internal quotation marks and citation omitted).

Where, as here, the parties cross-move for summary judgment on a claim (here, the Section 1983 claim for unlawful entry), the court is required to review the evidence submitted by the parties in support of their own motions and in opposition to the opposing party's motion in deciding each summary judgment motion. *Fair Hous. Council of Riverside Cnty., Inc., v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001). Further, that both parties move for summary judgment on the same claims does not mean that the facts are undisputed; rather, the court must independently evaluate whether a dispute of fact exists which defeats either summary judgment motion. *Id*.

**EVIDENTIARY OBJECTIONS**

Defendants have raised a number of evidentiary objections regarding the evidence Plaintiff has submitted in support of her motion for summary judgment and in opposition to Defendants' motion for summary judgment. Because the Court has not considered or relied upon any of the disputed evidence in reaching its decision herein, it sustains Defendants' objections, albeit not on the merits.

**DISCUSSION**

Plaintiff moves for summary judgment on her first claim for relief that Officer Wright's warrantless entry into her home violated her Fourth and Fourteenth Amendment rights. Defendants move for summary judgment on each of Plaintiff's claims. Given the multiple factual

disputes, summary judgment is improper on any claim.

## A. Plaintiff's Section 1983 Claims

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). To prevail on a Section 1983 claim, Plaintiff must show that the alleged conduct both occurred "under color of state law" and deprived Plaintiff of a constitutional or federal statutory right. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003).

Plaintiff pleads three Section 1983 claims predicated on violation of her rights under the Fourth and Fourteenth Amendments: (1) unlawful warrantless search, (2) unlawful arrest, and (3) excessive force. Essentially, Plaintiff alleges that Officer Wright unlawfully entered her home, that her resulting arrest was without probable cause, and that the officers used excessive force during the arrest. There is no dispute that Officers Wright and Bias were acting under color of law; thus, the only question is whether they are entitled to summary judgment because there is no dispute of fact with respect to the entry, arrest, or use of force, or, even if there is, whether they are entitled to qualified immunity.

### 1) Warrantless Entry Claim

Plaintiff contends that Officer Wright's entry into her home violated the Fourth Amendment because she did not have a warrant, there was no consent to her entry, and no emergency or exigency exception applies. Officer Wright counters that she believed she had consent to enter the house because one of the valets offered to show her where the homeowner was and led her into the house, and the valet had apparent authority to consent to her entry into the residence.

#### a) Disputes of Fact Prevent Summary Judgment

"A warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent." *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 533 (9th Cir. 2010). The parties agree that the emergency or exigency exceptions do not apply; the issue is consent.

11

"A third party's consent to the search of another person's belongings is valid if the consenting party has actual or apparent authority to consent." *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005). Actual authority to consent exists where: "(1) a third party had shared use and joint access to or control over a searched area; or (2) the owner of the property to be searched has expressly authorized a third party to give consent to the search." *United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013)(internal citation and quotation marks omitted). Absent proof of actual authority, consent may be established by means of the apparent authority doctrine. *Id*. at 1174-75. "Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *Id.*

The Ninth Circuit has adopted a three-part test for establishing apparent authority: (1) did the searching officer believe some untrue fact that was then used to assess the extent of the consent-giver's use of and access to or control over the area searched; (2) under the circumstances was it objectively reasonable to believe that the fact was true; and (3) assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority. *Ruiz*, 428 F.3d at 880-81; *see also Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990) ("determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists.") (internal citation and quotation marks omitted). Indeed, "[e]ven when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.'" *Rodriguez*, 497 U.S. at 188. Apparent authority exists where "numerous indicia of authority supported the officers' acceptance of consent to search." *Arreguin*, 735 F.3d at 1177 n.9 (concluding there was no apparent authority where the officers "did not know the legal occupants of the Residence; they did not ask for or receive identifying information from [the person who answered the door]; they did not ask for or receive information about [the person who opened the door's] control or authority over the Residence; and

12

they did not specifically obtain permission from [the person who opened the door] to search the entire premises"). "[M]ere access" to a residence, without more, is insufficient to establish apparent authority." *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (concluding that "the determination that [the officer] had authority to consent to the search simply because he answered the door to the apartment was not objectively reasonable.")

Defendants move for summary judgment on the grounds that Officer Wright had the consent of an individual with apparent authority—the valet—to enter the residence.[3] Viewing the evidence in the light most favorable to Plaintiff, however, a reasonable jury could find it was not objectively reasonable for Officer Wright to believe that the valet had authority to consent to her entry. The jury could find that Officer Wright knew (1) the valet was just a young man hired to park cars at a wedding, (2) was not the homeowner and did not otherwise reside in the residence, and (3) therefore did not have any authority to consent to a search of the residence. A jury could also find no consent, implied or otherwise, in light of the valet's testimony that he told Officer Wright that he was not the homeowner and that he would go get the homeowner and bring her to the Officer. Absent such consent, a reasonable jury could conclude that warrantless entry violated Plaintiff's Fourth Amendment rights. As discussed at oral argument, Defendants' motion for summary judgment on the question of whether Officer Wright is entitled to qualified immunity even if her entry was unconstitutional must likewise be denied.

Plaintiff's motion for summary judgment on whether Officer Wright's warrantless entry was unlawful presents a closer question. As explained at oral argument, in light of Officer Wright's testimony that she believed that the valet was escorting guests into and out of the residence, the Court cannot conclude as a matter of law that there are no set of provable facts which would entitle Officer Wright to at least qualified immunity. Accordingly, Plaintiff's motion for summary judgment is denied.

**2) Unlawful Arrest Claim**

Plaintiff pleads an unlawful arrest claim against both Officer Wright and Officer Bias. "A

---

[3] Defendants do not argue that Officer Wright had consent from someone with actual authority.

13

claim for unlawful arrest is cognizable under [42 U.S.C.] § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and Cnty of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Id*. at 966. In the context of an unlawful arrest, "the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is reasonably arguable that there was probable cause for arrest–that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (per curiam).

The police report and officer testimony reflect that Plaintiff was arrested for violation of California Penal Code 243(b): battery against a peace officer. As Defendants' state in their motion for summary judgment: "[w]here, as here, a warrantless arrest for battery on a police officer occurs inside a residence, one element of the offense in addition to those enumerated in the statute itself is that the officer was lawfully within the residence at the time the arrest was effectuated." (Dkt. No. 60 at 16-17.) *See People v. Wilkins*, 14 Cal.App.4th 761, 779 (1993); *see also Baranchik v. Fizulich*, 10 Cal. App. 5th 1210, 1215 (Cal. Ct. App. 2017) (citing California jury instruction for violation of Section 243(b) "The People have the burden of proving beyond a reasonable doubt that [the police officer] was lawfully performing his or her duties as a peace officer." ). Defendants thus concede that Plaintiff's first and second Section 1983 claims—for warrantless entry and unlawful arrest—both hinge on the lawfulness of Officer Wright's entry into Plaintiff's home. *See Wilkins*, 14 Cal.App.4th at 779. Because factual disputes preclude summary judgment on the lawfulness of Officer Wright's entry into Plaintiff's home, Officer Wright is likewise not entitled to summary judgment on the arrest claim.

Defendants also move for summary judgment on the unlawful arrest claim as to Officer Bias because he was not present when Plaintiff allegedly threw the water, and thus, he had no reason to suspect that Officer Wright's probable cause determination was improper. However, these facts are disputed. Both Plaintiff and Ms. Hill attest that Officer Bias was present at the time

14

of the water incident.  (Dkt. No. 65-2, Notter Decl. at ¶¶ 7-8; Dkt. No. 65-3, Hill Decl. at ¶ 2; *see also* Dkt. No. 65-1, Phelps Decl. at p. 88 (suggesting both officers were present at the time Officer Wright asked Plaintiff to turn down the music.)   As such, he too was responsible for assessing whether there was probable cause for arrest based on battery on a peace officer.  Further, because the facts surrounding the probable cause determination are in dispute with Plaintiff and other witnesses testifying that it was accidental and Officer Wright testifying that she believed it was deliberate, summary judgment is improper as resolution of this factual dispute is for the jury.  Because the Court must construe the facts in the light most favorable to Plaintiff as the non-moving party, the Court likewise cannot find that Officer Bias is entitled to qualified immunity.  A reasonable jury could conclude that a reasonable officer would not have determined that there was probable cause to arrest an individual for battery on a peace officer where the alleged battery was accidental and not intentional.  *See* Cal. Penal Code § 242 ("a battery is any *willful* and unlawful use of force or violence upon the person of another.") (emphasis added).

\*\*\*

Accordingly, Defendants' motion for summary judgment on the unlawful arrest claim is denied.

**3) Plaintiff's Excessive Force Claim**

Whether a defendant's use of force was "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Thus, the question is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. In making that determination, courts consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Kingsley v. Hendrickson*, 135 S Ct. 2466, 1472 (2015) (citing *Graham*, 490 U.S. at 296). The *Kingsley* factors are not exclusive; instead, the Supreme

15

Court expressly cautioned that courts should consider all of the circumstances it deems relevant.

The Ninth Circuit has noted that "[b]ecause such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, ... summary judgment ... in excessive force cases should be granted sparingly." *Santos v. Cates*, 287 F.3d 846, 853 (9th Cir. 2002) (citation omitted). Summary judgment may be appropriate, however, when the facts concerning an incident are largely undisputed. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[D]efendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."). When the circumstances show that there is no need for force, any force used is constitutionally unreasonable. *See Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) (citations omitted); *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), vacated on other grounds sub. nom. *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001).

Here, the level of force employed by the officers and any resistance on the part of Plaintiff are in dispute. Plaintiff testified that as soon as the water incident occurred the officers grabbed her arms and forcibly pushed her off the dance floor, into the side yard. She maintains that her arms were pulled behind her back and the handcuffs applied on top of her bracelets which was painful and that when she cried out that it hurt, Officer Wright tightened them further. Plaintiff testified that the officers ignored her repeated complaints that they were hurting her and that as she was moved to the front yard one of the officers kicked her back heel which fractured her heel bone and caused her knees to buckle. Finally, Plaintiff stated that she was pushed on top of the trunk of the police vehicle which bruised her torso. These facts must be accepted as true on summary judgment.

Thus, whether the force used by Officers Wright and Bias was reasonable cannot be decided as a matter of law. Likewise, when viewing the facts in a light most favorable to Plaintiff, the Court cannot conclude that a reasonable officer would have believed that Officer Wright's conduct was lawful. Defendants' motion for summary judgment on the excessive force claim and claim of qualified immunity regarding the same is therefore denied.

16

## B. Plaintiff's Bane Act Claims

The Bane Act provides a private right of action against a person who interferes by "threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state...." Cal. Civ. Code § 52.1. "There are two distinct elements for a section 52.1 cause of action. A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015), as modified on denial of reh'g (Mar. 6, 2015), review denied (May 20, 2015) (citations omitted).

Defendants insist that summary judgment is appropriate because there is no evidence that Plaintiff's rights were violated by Defendants' violence or a threat of violence. Not so. The Court has denied Defendants' motion for summary judgment on the excessive force and unlawful arrest claims. "Where, as here, an arrest is unlawful and excessive force is applied in making the arrest, there has been coercion 'independent from the coercion inherent in the wrongful detention itself'—a violation of the Bane Act." *Bender v. Cty. of Los Angeles*, 217 Cal. App. 4th 968, 978 (2013) (quoting *Shoyoye v. Cty. of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012)); *see also Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013) ("a successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1.").

Accordingly, Defendants are not entitled to summary judgment on Plaintiff's Bane Act claims which are predicated on the same facts as her excessive force and unlawful arrest claims. *See Barragan v. City of Eureka*, No. 15-CV-02070-WHO, 2016 WL 4549130, at *8 (N.D. Cal. Sept. 1, 2016) (denying summary judgment on a Bane Act claim because "an excessive force claim by its nature includes coercion beyond that inherent, for example, in an arrest or detention or search and seizure" and collecting cases re: the same).

## C. Plaintiff's Remaining State Law Claims

Defendants insist that they are entitled to summary judgment on Plaintiff's remaining state law claims—for invasion of privacy, trespass, battery, false imprisonment/arrest, intentional

17

infliction of emotional distress, and defamation—because these claims are all overlap with Plaintiff's Section 1983 and Bane Act Claims. Because the Court has denied summary judgment on the Section 1983 and Bane Act claims, summary judgment must necessarily be denied as to these state law claims as well.

## CONCLUSION

For the reasons stated above, the parties' cross motions for summary judgment are DENIED.

This Order disposes of Docket Nos. 56 and 60.

**IT IS SO ORDERED.**

Dated: June 23, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge